**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**DAVID ANSGAR NYBERG,**

      **Petitioner,**

**vs.**                                                  **4:03cv376-SPM/AK**

**JACKIE CRAWFORD, DIRECTOR
NEVADA D.O.C., AND
FLORIDA PAROLE COMMISSION,**

      **Respondents.**
_____/

## <u>REPORT AND RECOMMENDATION</u>

Petitioner has filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, Doc. 1, and has paid the filing fee. In his petition, Petitioner, who is a Florida inmate being housed in Nevada, complains that the Florida Parole Commission violated his constitutional rights with regard to a parole hearing.[1]  The Florida Parole Commission, after being allowed to intervene, Doc. 9, filed a response.  Doc. 11.  Petitioner has also requested discovery related to his equal protection claim.  Doc. 13.  Having carefully considered the matter, the Court

---

[1]In its order requiring response, the Court was under the impression that Petitioner was "not trained in the law...."  Doc. 2.  From a review of the documents which have been submitted, however, it appears that since his incarceration, Petitioner has received both law and doctorate degrees.  *See* Doc. 12, Ex. 10.

recommends that the petition for writ of habeas corpus be granted, as more fully explained below.

**BACKGROUND**

On March 14, 1980, Petitioner was convicted of first degree murder in Hillsborough County, Florida, and sentenced to life imprisonment with a minimum mandatory sentence of twenty-five years.  Doc. 11, Ex. A.[2]  At that time, the sentencing court recommended that Petitioner be confined in a minimum security facility.  In 1996, Petitioner was transferred to the Nevada Department of Corrections pursuant to an Interstate Correctional Compact with the State of Florida.[3]  Doc. 11, Ex. B.

In 1998, Petitioner was determined by the Commission to be "parole-eligible," and on September 30, 1998, a parole examiner conducted an initial review of Petitioner's file to determine a presumptive parole release date (PPRD).  Doc. 11, Ex. C.  Petitioner was not interviewed as part of the examiner's investigation, the memorandum to the Commission clearly stating that only "[Petitioner's] file was reviewed."  *Id.*  The memorandum detailed the circumstances of the crime as follows:

---

[2]From other documents in the file, it appears that Petitioner was originally convicted in 1975, but the judgment was vacated, and Petitioner was committed in December, 1975, for treatment pursuant to Fl. Stat. Ann. § 917.12.  Doc. 11, Ex. G & I.  Neither party supplied the Court with a copy of the commitment order.  Petitioner was resentenced after completion of treatment.  *Id.*

Chapter 917, entitled "Mentally Disordered Sex Offenders," was later repealed. The relevance of this commitment will be discussed *infra.*

[3]Respondents do not dispute Petitioner's contention that he "is not being protected from inmates in the Florida D.O.C. but from staff at the Florida D.O.C.'s Central Office." Doc. 1.

> [T]he inmate, the victim, and two co-defendants were at the victim's
> residence mutually engaging in drug use.  When the victim went to
> sleep, Nyberg cut the victim's throat with a knife.  The victim pleaded
> for his life and attempted to flee, but Nyberg pursued the victim and
> repeatedly stabbed him.  Nyberg and the co-defendants proceeded to
> clean up the murder scene and disposed of the victim's body in the
> state of Virginia.

*Id*.[4]

In the memorandum, the parole examiner also noted that Petitioner had "no disciplinary actions" and that he received "exceptional work evaluations."  *Id*.  Of particular note is the examiner's finding that "[n]o mental or physical dysfunction is noted in [a] recent [institutional progress] report."  *Id*.  The examiner recommended that the PPRD be March, 2040, based on the vulnerability of the victim, the brutality of the crime, the plan to avoid detection and arrest, and Petitioner's history of substance abuse.  *Id*.

In December, 1998, the Commission declined to affirm the examiner's recommendation and set Petitioner's PPRD as March 13, 2010, assessing the following as aggravating factors:

1.      The offense involved the use of a deadly weapon, Knife.

--------

[4]In state court proceedings, the Commission more fully alleged that Petitioner and the co-defendants were using drugs and decided to

> find a witch by the name of Debbie to relieve [Petitioner] from migraine
> headaches.  When they couldn't find Debbie, they returned to [a co-
> defendant's] home and shot up more narcotics.  Subsequently, the victim
> went to sleep and [Petitioner] made the statement that the victim was
> causing him to have migraine headaches and the only way he would get
> relief was to kill the victim.

Doc. 11, Ex. G.  In submitting this document to this Court, Respondents did not submit any of the supporting documentation noted therein.

2.      The offense was exceptionally cruel and heinous in that, in addition to slitting the victim's throat, he pled for his life while being stabbed repeatedly and that the [Petitioner] purposely muffled those screams by placing his hands over his mouth and that the death of the victim took a substantial period of time, in that he bled to death.

3.      After Commission of the crime, the subject and co-defendant fled the State of Florida with the body.

Doc. 11, Ex. D. At that time, the Commission did not mention Petitioner's prior

substance abuse or indicate any concern over his mental health.  The Commission

set July, 2000, as the date that Petitioner "will be reinterviewed for [his] subsequent

interview...."  *Id.*

In October, 2000, the Commission reviewed Petitioner's "progress report

dated 7/7/2000, from the Department of Prisons, Carson City, Nevada" and made no

change in his PPRD.  Doc. 11, Ex. E.  The Commission advised Petitioner that he

would be "reinterviewed for [his] subsequent interview during the month of May,

2005."  *Id.*  In setting the five-year interval for the "subsequent interview," the

Commission stated:

The Commission finds that your next interview date shall be within 5 years, rather than within 2 years from your last interview based on your conviction/sentence for Second Degree Murder and the Commission's finding that it is not reasonable to expect that you will be granted parole during the following years.  The basis for this finding is as follows:

1.      Deadly weapon use in the offense.
2.      The heinous nature of the crime.
3.      Mental health concerns.
4.      Any release will pose a risk to the public.
5.      The offense involved exceptionally brutal or heinous behavior indicative of wanton cruelty.

*Id.*  Petitioner was not personally or telephonically interviewed either by Florida or

Nevada officials before this decision was made.

On May 18, 2001, Petitioner filed a petition for writ of habeas corpus and/or writ of mandamus in state court.  Doc. 11, Ex. F.  In that petition, Petitioner raised eight grounds for relief.  The first three grounds related to Petitioner's allegations that he was denied due process by being labeled a sexual offender.  *Id.*  In the fourth allegation, Petitioner claimed a denial of equal protection based on the failure of the Commission to interview him in connection with his parole hearing.  *Id.*  In the fifth ground, Petitioner charged that the Commission improperly set off his next parole hearing for five years, and in the sixth ground, he charged that the Commission's findings of fact were erroneous, without support, and contrary to the information before the Commission.  *Id.*  The seventh and eighth grounds relate to the setting of the matrix and the failure to consider mitigation.  *Id.*

In response to the court's order to show cause, the Commission declined to address the sexual offender issues on the basis that it had "no statutory authority to classify an individual as a sex offender; therefore, the Commission is not the appropriate party to address this matter."  Doc. 11, Ex. G.  As to the due process claim, the Commission stated that it was in compliance with Florida statutes and the Commission's rules when it did not interview Petitioner but relied on status reports from Nevada in determining Petitioner's PPRD.  *Id.*  In arguing that the Commission acted properly in establishing the five-year set-off, it maintained that it was in compliance with Florida statutes and that it "simply reviews the entire official record–along with whatever old and new information is contained in the Department of Corrections' record–and makes parole decisions."  *Id.*

With regard to Petitioner's allegation that the Commission's findings were

erroneous and without record support, the Commission argued, in part, that its

conclusion regarding "mental health concerns" was based on Petitioner's

commitment for sexual offender treatment, his drug use during the commission of

the crime, and the circumstances of the killing.  *Id.*; *see also supra* at n.3.  The

Commission more fully explained:

> The Commission, when determining an inmate's eligibility for release to
> post prison supervision, must use whatever resources are available to
> determine parole eligibility....The Commission has a statutory duty to
> determine which inmates are eligible for parole....In order for the
> Commission to perform this duty, it must review what information is
> available to determine an inmate's eligibility for supervision, including
> information in the Department of Corrections' file.  To establish
> [Petitioner's] PPRD, the Commission reviewed [Petitioner's]
> Department of Corrections file.  The Postsentence Investigation is a
> part of [Petitioner's] Department of Corrections file and provided
> information regarding the circumstances of the offense.  The
> Commission properly relied on the information contained in the PSI and
> [Petitioner's] Department of Corrections file to determine that there
> were mental concerns.

*Id.*[5]

On November 27, 2001, the court denied the petition.  Doc. 11, Ex. H.  In

pertinent part, the court stated:

> The Court finds that the Commission was in compliance with Rule 23-
> 21.006(3)(b)8, Florida Administrative Code, when it established
> [Petitioner's] PPRD.  This rule requires that when an inmate is in
> another state, a summary of information is requested from the other
> jurisdiction for the purpose of establishing a PPRD.  This was done in
> this case.
>
> The Court further finds that the Commission properly established

---

[5]Although the Commission apparently provided a copy of the PSI to the state
court, *see* Doc. 11, Ex. I, it did not provide a copy in this proceeding.

[Petitioner's] next interview within five (5) years....

The Court also finds that there is no merit to [Petitioner's] claim that the Commission made findings of fact which were not supported by the record.  The Commission properly made findings of "mental health concerns"...when setting [Petitioner's] next interview within five (5) years. [Petitioner] has failed to demonstrate that the Commission made improper findings of fact.

*Id.*

Petitioner then filed a petition for a writ of certiorari with the court of appeal. Doc. 11, Ex. I.  In his certiorari petition, Petitioner charged that he continued to be improperly classified as an untreated mentally disordered sex offender (MDSO).  In support of this charge, Petitioner cited to a response by the Florida Department of Corrections (FDOC) to a grievance he had filed confirming his classification as a mentally disordered sex offender.[6]  *Id.*  He also directed the court to a May 20, 1999, letter from an assistant administrator in the FDOC Bureau of Classification, which stated: "[A]ccording to the PSI, a sex act occurred during the commission of the murder.  I go by the official documents that are in your inmate file."  *Id.*; *see also* Doc. 12, Ex. 9.  According to Petitioner, the "only involvement [he] has ever had in relation to a sexual offense is that he was raped as a child at the age of seven." Doc. 11, Ex. I.  He also advised the appellate court that he had no knowledge of the existence of a PSI until the Commission stated that it had used it in determining his PPRD, and he maintained that "[t]here are materially false allegations contained in the 'P.S.I.' which were used and apparently will be used again,

---

[6]It does not appear that a copy of this response was provided to the appellate court; it was not provided to this Court, and thus, the date of this response is unknown.

against the petitioner upon his parole hearing...."  Doc. 11, Ex. I.  He further

pointed out that the "only evidence before the Commission directly concerning the

petitioner's mental health is the report of Dr. Weir."[7]  *Id.*  In short, Petitioner argued

that he completed treatment before he was resentenced and that the claim of

mental health concerns was "disingenuous."  *Id.*

    With regard to the equal protection claim, Petitioner argued that there was

no rational reason for treating inmates incarcerated within Florida differently than

those confined outside Florida: "The difference between prisoners held within

Florida and those held outside of Florida is not so significant, in this day of

telecommunications and courtesy hearings, as to justify denying the out-of-state

prisoner any input in the interview process."  *Id.*  Petitioner pointed to a January 12,

2001, letter from a senior management analyst for the Commission, stating:

> When an inmate is incarcerated in another state, Florida requests that
> state to conduct a courtesy interview as it is not feasible to send

---

[7]In January, 1998, Dr. Shayne D. Weir, a psychologist, administered a battery of tests to Petitioner, including the Minnesota Multi-phasic Personality Inventory (MMPI), the WAIS-R, the Bender-Visual Motor Gestalt, the Thematic Apperception Test, and the Rorschach Ink Blot Test.  Doc. 12, Ex. 10.  He concluded:

> I find [Petitioner] to be a highly socialized individual with a well
> balanced character structure who has used his intelligence well and in
> the service of rehabilitation.  He has achieved highly in academic
> terms and this achievement is consistent with his intelligence, his
> social goals, and his over-socialized responses to the social system.
> He has handled his problems with authority by identifying with the law
> and learning the system and using it to his own advantage in an
> appropriate way. [Petitioner] has a strong need in this stage of life for
> affiliation and family and seems to portray himself as being completely
> rehabilitated and able to function within the larger social context.

*Id.*

> examiners to out-of-state institutions.  A guideline is sent to the state
> to request information that is needed to conduct the interview for
> Florida.  If the state fails to provide a courtesy interview, then Florida
> must rely upon progress reports.  Also, the input form that inmates are
> provided are used to supplement the progress report.

*Id.*; *see also* Doc. 12, Ex. 5.  As Petitioner notes, he was not provided an input form or any interview by anyone and thus was not afforded an opportunity to refute allegedly false information contained in his record.  Doc. 11, Ex. I.  In Petitioner's view, because he is being held out-of-state for his own protection from corrections officials, he has been forced to "waive the opportunity to participate in the parole interview or forego protection.  At best a Hobson's choice."  *Id.*

The appellate court denied the petition for writ of certiorari.  Doc. 11, Ex. J. Petitioner then filed the instant petition for writ of habeas corpus.  On this occasion, Petitioner raises three grounds for relief.  In the first ground, he claims a violation of the Due Process Clause based on the Commission's failure to interview him for parole.  Doc. 1.  In the second ground, Petitioner charges a violation of the Equal Protection Clause "when he was denied an interview prior to parole consideration while other prisoners who are similarly situated were and are granted the interview."  *Id.*  Finally, he alleges that he was denied due process "when he was falsely labeled as a sexual offender, and a parole hearing was conducted while that false information was in the record...."  *Id.*

In response, the Commission maintains that because Petitioner has no liberty interest in parole, he has no due process right to be interviewed for parole consideration.  Doc. 11.  With regard to his equal protection claim, the Commission argues that because Petitioner is not a member of a constitutionally protected

class, it need only show a rational basis for its differing treatment of inmates house within and outside of Florida.  *Id.*  More specifically, the Commission states that it has a "legitimate interest in not sending its representatives across the country to interview parole eligible inmates serving Florida sentences in other states based on economic and budgetary restraints."  *Id.*  Finally, the Commission concedes: "It appears that at some point the Florida Department of Corrections may have incorrectly determined that there was sexual conduct surrounding the First Degree Murder in this case, but that misinformation was subsequently corrected prior to establishment of the Petitioner's PPRD."  *Id.*  It argues, however, that Petitioner is not entitled to relief because neither the examiner's recommendation of a PPRD or the Commission's establishment of the PPRD contains any reference to Petitioner being a sex offender.  *Id.*

## DISCUSSION

Florida's parole system leaves the decision of whether or not to grant parole "to the discretion of the [Parole] Commission..."  *Jonas v. Wainwright*, 779 F.2d 1576, 1577 (11th Cir.), *cert. denied*, 479 U.S. 830 (1986) (citing *Moore v. Florida Parole & Probation Commission*, 289 So. 2d 719 (Fla. 1974)).   While it is true that prisoners may "claim the protections of the Due Process Clause," *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974), due process exists to protect a liberty interest.   "There is no constitutional right to parole in Florida."  *Jonas*, 779 F.2d at 1577 (citing *Hunter v. Florida Parole & Probation Commission*, 674 So. 2d 847, 848 (11th Cir. 1982)).[8]  Because there is no liberty interest

---

[8]"It is the intent of the Legislature that the decision to parole an inmate from the incarceration portion of the inmate's sentence is an act of grace of the state and shall

in parole, there is generally no trigger to bring in the protections of the Due Process Clause.  *Hunter*, 674 F.2d at 848 (rejecting claim that Commission improperly calculated presumptive parole release date and thus, violated due process; holding that because there was no liberty interest in parole, there was no due process violation).  Because a prisoner has no liberty interest in obtaining parole in Florida, he cannot complain about the constitutionality of procedural devices attendant to parole decisions, including the interval between parole hearings.  *See Allison v. Kyle*, 66 F.3d 71, 73-74 (5th Cir. 1995); *see also Staton v. Wainwright*, 665 F.2d 686 (5th Cir.), *cert. denied*, 456 U.S. 909 (1982) (because Florida parole statutes do not create protectable liberty interest in parole, there is no constitutional right to timely initial interview).

The only potential exception is the use of false information by the Parole Commission.  *Monroe v. Thigpen*, 932 F.2d 1437 (11th Cir. 1991) (holding that Parole Board's discretion does not permit it to knowingly rely on false information to deny inmate parole); *see also Thomas v. Sellers*, 691 F.2d 487, 489 (11th Cir. 1982) (stressing that "absent flagrant or unauthorized action by a parole board the discretionary power vested in a parole board will not be interfered with by the Federal courts"); *Damiano v. Florida Parole and Probation Commission*, 785 F.2d 929, 932 (11th Cir. 1986) (finding that inmate "raised a colorable due process claim with respect to the use of procedurally flawed disciplinary reports in modifying a PPRD").

It is here that this Court begins its focus.  As set forth above, Petitioner has consistently argued that there is false information in his Department of Corrections file

---

not be considered a right."  Fla. Stat. Ann. § 947.002(5).

which has branded him as a sexual offender.  While the Commission baldly maintains that the "misinformation" regarding the commission of a sexual offense during the murder at issue was corrected before the establishment of the PPRD, the record speaks otherwise.

Petitioner's PPRD was originally established in 1998, but months later, in May, 1999, there were still documents in Petitioner's FDOC inmate file which, according to an FDOC administrator, showed that a "sex act occurred during the commission of the murder...."  Doc. 12, Ex. 9.  Petitioner immediately attempted to correct this information via letters from the state court judge who presided over the murder trial and the prosecuting attorney.  The judge advised FDOC as follows:

> There was no PSI in this case.  According to the testimony and evidence presented at the trial, there was no allegation concerning a sexual act during the commission of the homicide.
>
> After the sentencing phase and pursuant to the motion filed by [Petitioner's] attorney, I signed an Order placing him in a State Hospital facility where, I understand, he received treatment relating to a sexual problem.
>
> I recommend you review the official documents to [Petitioner's] file to confirm the above.

Doc. 12, Ex. 7.

The prosecutor's letter more bluntly stated:

> I am in possession of a memorandum you prepared, dated May 20, 1999, regarding [Petitioner's] parole status and it contains a glaring error.
>
> I was the lead prosecutor throughout investigation and prosecution of [Petitioner].  There was no indication, assertion or allegation of any sexual activity during the commission of the offense.  It was a drug related, multiple stabbing without any relationship to sexual crime.
>
> Whoever indicated otherwise and placed it into a file did so without

knowledge of the true facts.

Doc. 12, Ex. 8 (emphasis in original).[9]

Though evidence may exist that FDOC "partially retract[ed]" certain statements made in the May, 1999, letter, *see* Doc. 11, Ex. I, that evidence has not been presented by the Commission.  Instead, the evidence which is before this Court indisputably shows that (1) as late as October, 2001, the Commission took the position that it has the right to review "the entire official record–along with whatever old and new information is contained in the Department of Corrections' records," Doc. 11, Ex. G; (2) that the  PSI was a part of Petitioner's official record; and (3) that at the time the PPRD was established in 1998, the PSI contained information that a sex act occurred during the course of the murder for which Petitioner was convicted.  The Commission now euphemistically labels this as "misinformation" and assures the Court that the "misinformation" has been removed from Petitioner's official file and that it never played any part in the Commission's decisions.  However, the **evidence** before this Court–not the **argument** of counsel or of Petitioner–shows that information which was not true and correct was indeed in Petitioner's file during the pertinent time period when the

---

[9]Attempts to correct Petitioner's file as it relates to the alleged sexual nature of the murder and to clarify his status have apparently been ongoing.  For example, in 1992, a deputy general counsel for FDOC was under the impression, after reviewing certain documents, that Petitioner did not "successfully complete[ ]" the MDSO program.  *See* Doc. 12, Ex. 12.  Furthermore, as previously noted, Petitioner filed a grievance regarding his classification as an MDSO, a classification which FDOC confirmed as "'valid.'" Doc. 11, Ex. I.  Although the Court does not know the date of this grievance or response, *see supra* n.6, it remains, in this Court's view, telling, as the Commission has not disputed, either before this Court or the court of appeal, the veracity of Petitioner's representation of this evidence.

Commission originally established Petitioner's PPRD,[10] and there is no evidence whatsoever that the "misinformation" was removed before the Commission's October, 2000, re-establishment of the 2010 PPRD.  On that occasion, the Commission set off its next "interview" of Petitioner for five years based on its determination that it was not reasonable to expect that Petitioner would be paroled during the interim.  Though the Commission is correct that it did not explicitly specify sexual offender status as a reason for the five-year set-off, it is entirely reasonable to conclude that the phrases "[m]ental health concerns" and "risk to the public" are flexible enough to encompass a factually baseless determination that Petitioner is a sexual offender since there is no other current evidence to support either of these justifications for the set-off.  Indeed, the record evidence before this Court is to the contrary.  *See*, *e.g.*, Doc. 12, Ex. 7, 8, 10, & 13.  This Court is absolutely not prepared to assume that the "misinformation" played no role in the Commission's decision simply because it does not specifically mention it.

With that said, the Court turns to the other viable argument which Petitioner has presented to this Court, that is, that there is no rational reason for treating him, as an out-of-state prisoner, differently than an in-state prisoner with regard to how parole interviews and hearings are conducted.  In assessing an equal protection claim where there is no suspect class or infringement on a fundamental right, the Court must determine whether the challenged action "is rationally related to a legitimate state

---

[10]Petitioner argues that FDOC "did not back off its intentionally false position until May 2002 in its Answer [to his petition for writ of certiorari before the court of appeal] where D.O.C. finally admitted the allegation was false but steadfastly refused a legal obligation to inform the parole Commission, and others, of their allegation."  Doc. 12. Although Petitioner did not present evidence to support this claim, the Commission has again not disputed Petitioner's representation.

interest," *Lofton v. Secretary of Department of Children*, 358 F.3d 804, 818 (11th Cir. 2004), i.e., whether it is "rationally related to the achievement of a legitimate government purpose."  *United States v. Ferreira*, 275 F.3d 1020, 1026 (11th Cir. 2001). This entails a two-part analysis:

> The first step in determining whether legislation survives rational-basis scrutiny is identifying a legitimate government purpose–a goal–which the enacting government body *could* have been pursuing....The second step of rational-basis scrutiny asks whether a rational basis exists for the enacting governmental body to believe that the legislation would further the hypothesized purpose.  The proper inquiry is concerned with the *existence* of a conceivably rational basis, not whether that basis was actually considered by the legislative body.  As long as reasons for the legislative classification may have been considered to be true, and the relationship between the classification and the goal is not so attenuated as to render the distinction arbitrary or irrational, the legislation survives rational-basis scrutiny.

*Ferreira*, 275 F.3d at 1026 (emphasis in original).

Petitioner's equal protection challenge hinges on Fla. Stat. Ann. § 947.16, which states, in pertinent part, that every convicted felon who has a good record during confinement shall be eligible for a parole "interview."  The Commission's rules, however, deny a parole "interview" to any inmate serving his sentence outside of the State of Florida.  Instead, the parole examiner need only request from the incarcerating state a summary of information contained in the inmate's file before forwarding his written recommendation and pertinent file information to the Commission for establishment of the PPRD.  *See* Fla. Admin. Code Ann. r. 23-21.006(3)(b)(8).  In contrast, a prisoner housed within Florida is entitled to an "interview."  At that interview, the parole examiner "shall explain" and "shall discuss" various subjects with the prisoner, who is then "orally informed of the examiner's final recommendation."  At the conclusion of the interview,

the inmate "shall be requested to sign a statement which is an acknowledgment that the inmate was present during the initial interview and was verbally advised of the recommendation in his case."  Fla. Admin. Code. Ann. r. 23-21.006(8).

The reason advanced by the Commission for denying out-of-state prisoners the parole interview which is granted to in-state prisoners is "economic and budgetary restraints."  The Court certainly accepts this as a legitimate government interest, and thus, Respondent meets the first part of rational-basis scrutiny.  The question becomes then whether Petitioner has carried his burden of "'negati[ng] every conceivable basis which might support [the rule], whether or not the basis has a foundation in the record.'" *Jackson v. State Board of Pardons*, 331 F.3d 790, 797 (11th Cir. 2003) (citation omitted).

At first blush, it seems "'reasonably conceivable,'" *id.* (citation omitted), that to save money, Respondent would be entitled to subject two prisoners seeking the establishment of a PPRD--one housed outside Florida and the other inside Florida--to significantly differently treatment.  However, as Petitioner succinctly points out in his motion for discovery, "With the use of telecommunications, or having Nevada conduct a hearing...any claim that extraordinary expense mandates denial of the interview [is negated.]" Doc. 13.  Indeed, Respondent Crawford's own words to the Secretary of FDOC amply illustrate why the Commission's proffered reason is not a rational basis for the variance in treatment:

> In the event [Petitioner] remains within the confines of the Nevada Department of Corrections, this Department will cooperate in any way necessary to arrange a courtesy hearing before the Nevada Board of Parole Commissioners or possibly a videoconference hearing. Coordination of reports and a hearing can be arranged through the Chairperson of the Nevada Board of Parole Commissioners, respectively. I want to stress that the Nevada Department of Corrections does not

necessarily support the veracity of [Petitioner's] claims, but I want to ensure the Department's cooperation in addressing and resolving any problems that may exist regarding this matter.

Doc. 12, Ex. 6.

The Commission itself recognizes that there are ways to provide an out-of-state prisoner with an interview even in light of "economic and budgetary restraints." In early 2001, the Commission suggested to Petitioner that courtesy interviews were the norm, unless the state where the inmate is incarcerated "fails to provide a courtesy interview." Doc. 12, Ex. 5.  Only then must the Commission "rely upon progress reports."  *Id*.  Even in that situation, however, the inmate is given an "input form [which is] used to supplement the progress report."  *Id*.  The clear implication of these statements is that Florida requested a courtesy interview of Petitioner and the State of Nevada failed to provide the interview.

The implication that Nevada had not cooperated in arranging a courtesy interview touched off a series of communications, beginning with a letter from the Nevada State Public Defender who was so concerned that he requested the Commission provide him "with a copy of the request which was sent together with the guideline for the interview so that [he could] look into Nevada's failure to respond, correct the error and take steps to see that it does not happen again in the future."  Doc. 12, Ex. 3.  In response to the public defender's concerns, the Commission, on October 2, 2002, indicated that it was attaching a copy of the 1998 request to Nevada for a courtesy interview of Petitioner and stated:

> [The 2001] letter to [Petitioner] was an effort to explain to him why a progress report was used in lieu of a face-to-face interview.  The Commission will accept a progress report in lieu of an interview if it

contains the required information, as it is not feasible for this agency to send someone from Florida to another state to conduct the interview and the other state may not be equipped to conduct a courtesy interview. The progress report provided by Nevada was more than sufficient.[11]

I did not intend to make it seem as though Nevada had been uncooperative. There may have been good reason and an agreement between the interstate compact office and the State of Nevada to provide a progress report instead of conducting the interview. Any specific information regarding this matter would have to be addressed to the institution in Nevada or the Department of Corrections Interstate Compact Administrator....

[Petitioner's] next "interview" is scheduled for May 2005.

Doc. 12, Ex. 4.

On January 20, 2004, the public defender wrote the Governor of the State of Nevada and members of the Nevada Pardons Board "to inform [them] of [his] efforts to obtain records from Florida in [Petitioner's] case." Doc. 12, Ex. 2. The public defender stated the Commission's October, 2002, letter "did not include copies of Florida's request for the courtesy interview or Nevada's response." *Id.* The public defender then made a series of telephone calls which culminated as follows: "I have never received any response [to his request for documents]. It appears the State of Florida is unable or unwilling to provide copies of these documents." *Id.*

Respondent Crawford's letter to the Secretary of FDOC offering to conduct a courtesy interview of Petitioner, *see supra*, followed this correspondence and

---

[11]The Court does not quite understand how a progress report is"sufficient" when it does not cover the same items for the out-of-state prisoner which the parole examiner must discuss with the in-state prisoner under the Commission's rules. See, e.g., Doc. 11, Ex. B.

Petitioner's appearance before the Nevada Pardons Board.[12]

While the Court recognizes the infeasibility of sending parole examiners to every state where Florida houses inmates, it does not believe that this can stand as a rational basis for differentiating between in-state and out-of-state prisoners in the matter of parole interviews.  As Petitioner has pointed out through Respondents' own words, there are recognizable ways to achieve the goal of saving money without imposing a classification that is "so attenuated [to the goal] as to render the distinction...irrational...." *Ferreira*, 275 F.3d at 1026.  Thus, the distinction imposed on inmates housed outside the State of Florida embodied in Fla. Code Ann. r. 23-21.006(3)(b)(8) violates equal protection as it cannot survive even a rational-basis scrutiny.

## CONCLUSION

Having carefully considered the matter, the Court finds that Petitioner's right to due process was violated when his PPRD was established with information in his file which was false and that his right to equal protection was violated when his PPRD was established without benefit of an interview.  These conclusions, of course, do not imply that the Court has any opinion as to whether Petitioner should be paroled or have his PPRD changed in any manner; he is, however, entitled to an interview of some sort and a consideration for parole which is devoid of any false information.  In light of these findings, discovery is not necessary.

---

[12]At that time, the Pardons Board determined that Petitioner's complaint "that he ha[d] not received adequate communication from the State of Florida" and his request "that he wanted to have access to the Parole Board, as opposed to in-absentia hearings" were "more appropriately addressed through the two Departments of Corrections and the two Parole Board Commissions as opposed to the Pardons Board."  Doc. 12, Ex. 6.

Accordingly, it is respectfully **RECOMMENDED**:

That the petition for writ of habeas corpus, Doc. 1, be **GRANTED** in so far as he seeks an parole interview and hearing but **DENIED** in so far as he seeks release;

That the motion for discovery, Doc. 13, be **DENIED**;

That the Florida Parole Commission be ordered to immediately make this Report and Recommendation and the order adopting it a prominent part of its official Commission record on the Petitioner, David Ansgar Nyberg;

That, within fourteen (14) days after the adoption of the Report and Recommendation, the Florida Parole Commission be ordered to certify to this Court and to Petitioner that it has removed from its official file on David Ansgar Nyberg (1) any information related to statements made in the May 20, 1999, letter, Doc. 12, Ex. 9, that "a sex act occurred during the commission of the murder" and (2) any other information that labels Petitioner as a mentally disordered sex offender or that indicates that he was committed for MDSO treatment based on the false information that "a sex act occurred during the commission of the murder";

That, as soon as practicable, but not later than May 31, 2005, the Florida Parole Commission be ordered (1) to conduct a parole interview of Petitioner, in whatever manner feasible, whether in person, telephonically, through videoconferencing, or via a courtesy interview conducted by the appropriate personnel from the State of Nevada, and (2) to take official Commission action on the results of that interview as they relate to Petitioner's PPRD.

**IN CHAMBERS** at Gainesville, Florida, this **22nd** day of February, 2005.


**s/ A. KORNBLUM**
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**