IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

DAVID ANSGAR NYBERG.

        Petitioner,

vs.                                    CASE NO: 4:03cv376-SPM/AK

JACKIE CRAWFORD, Director,
NEVADA D.O.C., and
FLORIDA PAROLE COMMISSION,

        Respondents.

_____/

## <u>ORDER DENYING PETITION FOR<br>WRIT OF HABEAS CORPUS</u>

This cause comes before the Court on the Report and Recommendation (Doc. 15) to grant relief to Petitioner on his petition for writ of habeas corpus (Doc. 1).  The Petitioner alleges that the Florida Parole Commission violated his right to due process and equal protection by failing to grant him a parole interview because he is housed in Nevada.  Petitioner also claims that the existence of false information in his Department of Corrections file during parole consideration violated his right to due process.

Upon de novo review of the record, supplemented with new information that the Florida Parole Commission failed to provide to the Magistrate Judge, the Court finds that Petitioner has not demonstrated that the Florida Parole Commission or Nevada corrections officials violated his constitutional rights.

## Background Information

On March 17, 1980, Petitioner was sentenced for first degree murder in Hillsborough County, Florida to life imprisonment with a minimum mandatory sentence of twenty-five years.  (Doc. 11, Ex. A.)  Although Petitioner was convicted in 1975, Petitioner was committed for treatment pursuant to section 917.12 of the Florida Statutes, entitled "Mentally Disordered Sex Offenders," (repealed in 1979) and resentenced in 1980.  (Doc. 11, Ex. G & I.)[1]  In 1996, Petitioner was transferred to the Nevada Department of Corrections pursuant to its Interstate Corrections Compact with the State of Florida codified as Florida Statutes §§ 941.55 et seq.[2]

In 1998, the Florida Parole Commission determined that Petitioner was "parole-eligible."  On September 30, 1998, a parole examiner conducted an initial review of Petitioner's file to determine a presumptive parole release date (PPRD) of 2040.  (Doc. 11, Ex. C.)[3]  In December 1998, the Respondent Commission revised the parole examiner's recommendation and set Petitioner's PPRD as

_____

[1]  Also at that time, the sentencing court recommended that Petitioner be confined at a minimum security prison.

[2]  Respondents do not dispute Petitioner's contention that he "is not being protected from inmates in the Florida D.O.C. but from staff at the Florida D.O.C's Central Office." (Doc.1.)

[3]  The parole examiner's memorandum noted that Petitioner had "no disciplinary actions" and that he received "exceptional work evaluations." (Doc. 11, Ex. C) Although the parole examiner stated that "no mental or physical dysfunction is noted in [a] recent [institutional progress] report. . .[,]" the examiner cited the brutality of the crime, the vulnerability of the victim, the plan to avoid detection and arrest, and Petitioner's history of substance abuse, in setting the PPRD.

March 13, 2010.  (Doc. 11, Ex. D.)  At that time, the Commission made no

mention of Petitioner's prior substance abuse or concerns over his mental health.

However, the Commission, in setting Petitioner's PPRD, cited the use of a deadly

weapon, the "exceptionally cruel and heinous" nature of the crime, and that the

"subject and co-defendant fled the State of Florida with the body."  (Doc. 11, Ex.

D.)  Although the Commission did not interview Petitioner on this occasion, the

Commission set July 2000 as the date that Petitioner would be "reinterviewed" for

parole.  (Doc. 11, Ex. D.)

        In October 2000, the Commission reviewed Petitioner's "progress report

dated July 7, 2000 from the Department of Prisons, Carson City, Nevada" and

made no change to his PPRD.  (Doc. 11, Ex. E.)  The Commission advised

Petitioner that he would be "reinterviewed . . . during the month of May, 2005."

(Doc. 11, Ex. E.)  In setting off Petitioner's next "interview" for five years, the

Commission found that it was not reasonable to expect that Petitioner would be

granted parole in 2002.  (Doc. 11, Ex. E.)  To support its finding, the Commission

cited 1) the use of a deadly weapon in the offense, 2) the heinous nature of the

crime, 3) mental health concerns, 4) the risk to the public if Petitioner were

released, and 5) the "exceptionally brutal" nature of the crime which indicated

wanton cruelty.  (Doc. 11, Ex. E.)  Neither Florida nor Nevada officials

interviewed Petitioner before this decision was made.

        On May 18, 2001, Petitioner filed a petition for writ of habeas corpus in

state court.  (Doc. 11, Ex. F.)  In his petition, Petitioner raised four claims based

on due process and equal protection grounds.  (Doc. 11, Ex. F.)  He also raised

three other claims based on violations of parole regulations.  (Doc. 11, Ex. F.)

The state court issued an order to show cause.

      In response to Petitioner's argument that he was misclassified as a

MDSO, the Commission argued that it was not the appropriate party because it

had "no statutory authority to classify an individual as a sex offender."  (Doc. 11,

Ex. G.)  The Commission also argued that it complied with Florida statutes when

it relied on status reports on Petitioner from the Nevada Department of

Corrections in lieu of interviewing Petitioner.  (Doc. 11, Ex. G.)  The Commission

further argued that it complied with Florida statutes when it deferred Petitioner's

next parole "interview" for five years.  (Doc. 11, Ex. G.)  In sum, the Commission

maintained that it complied with Florida statutes in "simply review[ing] the entire

official record–along with whatever old and new information is contained in the

Department of Corrections' record–and mak[ing] parole decisions." (Doc. 11, Ex.

G.)

      With regard to Petitioner's allegation that the Commission's findings were

erroneous and without record support, the Commission argued that its conclusion

regarding "mental health concerns" was based on Petitioner's commitment for

sexual offender treatment, his drug use during the commission of the crime, and

the circumstances of the offense.[4]  (Doc. 11, Ex. G at 9.)  The Commission

explained that it relied on the information in the Post-Sentence Investigation

Report (PSI) and Petitioner's Department of Corrections file.[5]  Although the

Commission apparently provided a copy of the PSI to the state court, it did not

provide a copy to the Court in the instant proceeding until after the Magistrate

Judge issued his Report and Recommendations.  See Doc. 11, Ex. I; Doc. 16,

Ex. A.

Petitioner was not aware of the existence of a PSI until the Commission

stated that it had used it in determining his PPRD in 1998.  After learning about it,

Petitioner immediately attempted to correct the misapprehension that he was a

sex offender.  Petitioner submitted letters to the Florida Department of

Corrections (FDOC) from the state court judge who presided over Petitioner's

trial as well as from the prosecuting attorney in Petitioner's trial.  Both letters

were sent in response to an FDOC administrator's letter, dated May 20, 1999,

---

[4]  The Commission more fully explained:

> The Commission has a statutory duty to determine which inmates are eligible for
> parole . . . .  In order for the Commission to perform this duty, it must review what
> information is available to determine an inmate's eligibility for supervision including
> information in the Department of Corrections file. To establish [Petitioner's] PPRD,
> the Commission reviewed [Petitioner's] Department of Corrections file. The
> Postsentence Investigation [PSI] is a part of [Petitioner's] Department of Corrections
> file and provided information regarding the circumstances of the offense. The
> Commission properly relied on the information contained in the PSI and [Petitioner's]
> Department of Correction's file to determine that there were mental health concerns.

(Doc. 11, Ex. G.)

[5]  See supra note 4.

stating that according to the PSI in Petitioner's inmate file, a "sex act occurred during the commission of the murder." <u>See</u> Doc. 12, Ex. 7, 8, 9.  Although the Magistrate Judge did not have a copy of the PSI, it has since been provided to the Court by the Respondent Commission and a review of the PSI shows no indication that a sex act occurred during the commission of the offense.

In denying the petition on November 27, 2001, the state court found that the Respondent Commission complied with Florida Administrative Code Rule 23-21.006(3)(b)8. when it established Petitioner's PPRD by relying on a summary of information requested from Nevada.  (Doc. 11, Ex. H.)  The court also found that the Commission properly deferred Petitioner's next "interview" for five years.  (Doc. 11, Ex. H.)  Finally, the court rejected as meritless Petitioner's claim that the Commission's findings of fact regarding "mental health concerns" were without record support.  (Doc. 11, Ex. H.)

Petitioner then filed a petition for writ of certiorari with the court of appeal.  (Doc. 11, Ex. I.)  That petition was also denied.  (Doc. 11, Ex. J.)  In his petition for writ of certiorari, citing a response to a grievance[6] he filed with the FDOC plus the May 20, 1999 letter from the FDOC administrator confirming his status as a mentally disordered sex offender (MDSO), Petitioner complained that he

---

[6] It does not appear that a copy of this response was provided to the appellate court; it was not provided to this Court thus, the date of the response to this grievance is unknown. The Court notes that a June 9, 1992 letter from Susan Maher, Deputy General Counsel at the Florida Department of Corrections, states: "As to your completion of the MDSO program, the documents I reviewed do not support your contention that you successfully completed the program." (Doc. 12, App. 12.)

CASE NO: 4:03cv376-SPM/AK

continued to be improperly classified as an MDSO.  According to Petitioner, "the

only involvement [he] has ever had in relation to a sexual offense is that he was

raped . . . at the age of seven."  (Doc. 11, Ex. I.)  Petitioner complained about the

Commission's purported reliance on a PSI in determining his PPRD and he

maintained that "[t]here are materially false allegations contained in the 'PSI'

which were used and apparently will be used again against the [P]etitioner upon

his parole hearing."  (Doc. 11, Ex. I.)  Petitioner stressed that the only competent

evidence before the Commission concerning his mental health was a report

prepared by Dr. Weir.[7]  (Doc. 11, Ex. I.)  In short, Petitioner argued that he

completed treatment before he was resentenced and that the claim of mental

health concerns was "disingenuous."  (Doc. 11, Ex. I.)

Moreover, with regard to his equal protection claim, Petitioner argued to

the appellate court that there was no rational basis for treating those inmates

incarcerated within Florida differently than those confined outside of Florida for

---

[7] In January, 1998, Dr. Shayne D. Weir, a psychologist, administered a battery of tests to
Petitioner, including the Minnesota Multi-phasic Personality Inventory(MMPI), the WAIS-R, The
Bender Visual-Motor Gestalt, the Thematic Apperception Test, and the Rorschach Ink Blot Test.
(Doc. 12, Ex. 10.) He concluded:

I find [Petitioner] to be a highly socialized individual with a well balanced character
structure who has used his intelligence well and in the service of rehabilitation. He
has achieved highly in academic terms and this achievement is consistent with his
intelligence, his social goals, and his over-socialized responses to the social system.
He has handled his problems with authority by identifying with the law and learning
the system and using it to his own advantage in an appropriate way. [Petitioner] has
a strong need in this stage of his life for affiliation and family and seems to portray
himself as being completely rehabilitated and able to function within the larger social
context.

(Doc. 12, App. 10.)

CASE NO: 4:03cv376-SPM/AK

parole interview purposes.  (Doc. 11, Ex. I.)  "The difference between prisoners held within Florida and those held outside [of] Florida is not so significant, in this day of telecommunications and courtesy hearings, as to justify denying the out-of-state prisoner any input in the interview process."  (Doc. 11, Ex. I.)  Petitioner pointed to a January 12, 2001 letter he received from a Senior Management Analyst for the Commission stating:

> When an inmate is incarcerated in another state, Florida requests that state to conduct a courtesy interview as it is not feasible to send examiners to out-of-state institutions.  A guideline is sent to the state to request information that is needed to conduct the interview for Florida. If the state fails to provide a courtesy interview, then Florida must rely upon progress reports.  Also, the input form that inmates are provided are [sic] used to supplement the progress report.

 (Doc. 11, Ex. I; Doc. 12, App. 5 .)  Petitioner notes that he was not provided an input form or an interview and thus was unable to participate at all in the parole process or refute the allegedly false information in his file. (Doc. 11, Ex. I.)

According to the January 2001 letter, the Respondent Commission recognizes that there are ways to provide an out-of-state prisoner with an interview even in light of economic and budgetary constraints.  The letter suggests that courtesy interviews are the norm unless the state where the inmate is incarcerated "fails to provide a courtesy interview."  At the very minimum, the inmate is generally afforded the opportunity to complete an "input form [which is] used to supplement the progress report."  The clear implication of these statements is that Florida requested a courtesy interview for Petitioner and the State of Nevada failed to

provide one.

The implication that Nevada had not cooperated in arranging a courtesy interview touched off a series of communications, beginning with a letter from the Nevada State Public Defender. (Doc. 12, App. 3.) The public defender requested that the Commission provide him "with a copy of the request which was sent together with the guideline for the interview so that [he could] look into Nevada's failure to respond, correct the error and take steps to see that it does not happen again in the future." (Doc. 12, App. 3.) In response to his concerns, the Commission, on October 2, 2002, indicated that it was attaching a copy of the 1998 request for a courtesy interview of Petitioner and stated:

> [The 2001] letter to [Petitioner] was an effort to explain to him why a progress report was used in lieu of a face-to-face interview. The Commission will accept a progress report in lieu of an interview if it contains the required information, as it is not feasible for this agency to send someone from Florida to another state to conduct the interview and the other state may not be equipped to conduct a courtesy interview. The progress report provided by Nevada was more than sufficient.[8]

> I did not intend to make it seem as though Nevada had been uncooperative. There may have been good reason and an agreement between the interstate compact office and the State of Nevada to provide a progress report instead of conducting the interview. Any specific information regarding this matter would have to be addressed to the institution in Nevada or the Department of Corrections Interstate Compact Administrator.

---

[8] The letter does not explain how a progress report is "sufficient" when it does not cover the same items for the out-of-state prisoner which the parole examiner must discuss with the in-state prisoner under the Commission's rules. Compare Doc. 11, Ex. B. with Fla. Admin. Code Ann. r. 23-21.006(8).

[Petitioner's] next "interview" is scheduled for May 2005.

(Doc. 12, App. 4.)

On January 20, 2004, the public defender wrote the Governor of the State of Nevada and members of the Nevada Pardons Board "to inform [them] of [his] efforts to obtain records from Florida in [Petitioner's] case."  (Doc. 12, App. 2.)  The public defender stated that the Commission's October 2002 letter "did not include copies of Florida's request for the courtesy interview or Nevada's response."  (Doc. 12, App. 2.) He stated that after a series of phone calls requesting the documents, "[he] never received any response."  (Doc. 12, App. 2.)  He concluded that "the State of Florida is unable or unwilling to provide copies of these documents."  (Doc. 12, App. 2.)  Thus, despite the indication in the Commission's October 2002 letter that  a copy of the request for a courtesy interview was attached, it does not appear that the Nevada Public Defender ever received it.

Following this correspondence, which prompted Petitioner's hearing before Nevada's Pardons Board,[9] Respondent Crawford sent a letter, dated January 26, 2004, to the Secretary of the FDOC offering to conduct a courtesy interview of Petitioner.  (Doc. 12, App. 6.)  In this letter, Respondent Crawford confirmed that "[s]taff within the Nevada Department of Corrections have no record of a request for

---

[9]  At that time, the Pardon's Board determined that Petitioner's complaint "that he ha[d] not received adequate communication for the State of Florida" and his request "that he wanted to have access to the Parole Board, as opposed to in-absentia hearings" were "more appropriately addressed through the two Departments of Corrections and the two Parole Board Commissions as opposed to the Pardons Board." (Doc. 12, App. 6.)

a courtesy hearing for [Petitioner] in the past" and "noted that in 2005 he is scheduled for another hearing."  (Doc. 12, App. 6.)  Finally, Respondent Crawford assured the FDOC that "the Nevada Department of Corrections . . . will cooperate in any way necessary to arrange a courtesy hearing" before the Nevada parole board "or possibly a videoconference hearing."  (Doc. 12, App. 6.)

These requests for courtesy interviews by the Florida Parole Commission were conspicuously absent from the record until the Magistrate Judge issued his Report and Recommendations on February 22, 2005.  Appended to its "Objection to Report and Recommendation," the Respondent Commission submitted copies of two letters which it represents are requests to Nevada officials to conduct courtesy interviews of Petitioner.  (Doc. 16, Ex. G & H.)  The letters, dated August 17, 1998 and June 21, 2000, are respectively contemporaneous to the dates Petitioner received his initial parole review and first biennial review.

The Court now turns to the instant petition to discuss Petitioner's claims and Respondents' arguments in turn.

**A. The Respondent Commission's Failure to Interview Petitioner for Parole**

Petitioner's first due process claim concerns the Florida Parole Commission's failure to interview him for parole.  Respondents correctly argue that Petitioner has no liberty interest in parole.  Respondents also argue that the Florida Parole Commission complied with Florida Administrative Rule 23-21.006(3)(b)8., and that although courtesy interviews were requested, Nevada

officials "dropped the ball" in responding to those requests.  Finally, Respondents

argue that absent "flagrant or unauthorized action" on the part of the Parole

Commission, there are no grounds to support a finding of a due process

violation.

Florida's parole system leaves the decision of whether to grant parole "to

the discretion of the [Parole] Commission . . . ." Jonas v. Wainwright, 779 F.2d

1576, 1577 (11th Cir. 1986).  A prisoner cannot raise due process challenges to

the procedures attendant to the parole decisions.  Allison v. Kyle, 66 F.3d 71, 73-

74 (5th Cir. 1995); see, e.g., Staton v. Wainwright, 665 F.2d 686, 688 (5th Cir.

1982) (stating that because there is no cognizable interest in parole, a prisoner

has no constitutional right to a timely initial interview).  Moreover, there is no

recognized liberty interest to parole in Florida.  See Jonas, 779 F.2d at 1577

(citing Hunter v. Fla. Parole and Probation Comm'n, 674 So. 2d 847, 848 (11th

Cir. 1982)).  Accordingly, without regard to the exception that will be discussed in

Part C infra, there is generally no trigger to bring about the protections of the Due

Process Clause to review parole matters.  See Hunter v. Fla. Parole and

Probation Comm'n, 674 So. 2d 847, 848 (11th Cir. 1982) (holding that where the

state creates no liberty interest in parole, there can be no due process violation).

Thus,"federal courts should not interfere with the discretionary decisions of [a

state parole] [b]oard 'absent flagrant or unauthorized action' by the [b]oard."

Monroe v. Thigpen, 932 F.2d 1437, 1441 (11th Cir. 1991)  (quoting Thomas v.

Sellers, 691 F.2d 487, 489 (11th Cir. 1982)).

To the extent Petitioner can claim that his due process rights[10] were violated by flagrant or unauthorized actions, the Respondent Commission submitted copies of letters dated August 17, 1998 and June 21, 2000 to support its contention that it "did everything required of it" and that Nevada never responded to those written requests for courtesy interviews.  (Doc. 16 at 12.) Consequently, the Commission assigns its failure to provide for Petitioner's interview to "entities not under the Commission's authority [who] apparently 'dropped the ball.'"  (Doc. 16 at 12.)

The Commission's decision to go forward with the paper review in light of the apparent miscommunication is one that the Court will not disturb absent evidence of flagrant or unauthorized action.  See Thomas v. Sellers, 691 F.2d 487, 489 (11th Cir. 1982).  Although missteps are evident from the record, the failure to follow-up by any Respondent does not amount to flagrant or unauthorized action.  Thus, the Court finds that these do not rise to the level required to constitute a due process violation on the part of Respondents.

---

[10]  It is doubtful whether such a due process claim is viable.  As stated previously, Petitioner has no liberty interest in parole that would trigger procedural due process protection.  A substantive due process claim applies to deprivations of fundamental liberty interests but not for arbitrary deprivations of nonfundamental liberty interests.  See City of Cuyahoga Falls v. Buckeye, 538 U.S. 188, 200-201 (2003) ("It would be absurd to think that all 'arbitrary and capricious' government action violates substantive due process . . . . Those who claim 'arbitrary' deprivations of non-fundamental liberty interests must look to the Equal Protection Clause . . . .").

**B. Petitioner's Out-of-State Classification**

Petitioner claims that his out-of-state classification has forced him to "waive the opportunity to participate in the parole interview or forego [the] protection" for which he was transferred out of state.  (Doc. 11, Ex. I.)  Petitioner argues that there is no rational reason for denying out-of-state prisoners the same opportunity to participate in the parole process that is afforded to inmates incarcerated in-state.  Petitioner's equal protection challenge hinges on section 947.16(1) of the Florida Statutes, which states, in pertinent part, that every convicted felon who has a good record during confinement shall be eligible for a parole "interview."

Respondents submit that Florida Administrative Code Rule 23-21.006(3)(b)8. requires only that the Respondent Commission request from the incarcerating state a summary of information contained in the inmate's file.  However, the Court notes that Respondents' reliance on Rule 23-21.006(3)(b)8. is misplaced.  That administrative rule expressly applies only to prisoners convicted on or after April 20, 1982.  See Fla. Admin. Code Ann. r. 23-21.006(3)(b)(8); see also Fla. Admin. Code Ann. r. 23-21.018(5)(a)-(b).  Petitioner, who was convicted in 1975, is not within that class.

Moreover, the rule only addresses initial interview procedures.  See Fla. Admin. Code Ann. r. 23-21.006(3)(b)8.  Thus, it appears that, absent special circumstances, Petitioner should have received his initial interview according to

the procedures set out in Florida Administrative Code Rules 23-21.006(3)(a) and 23-21.006(8).  For his subsequent "interviews," absent special circumstances, Petitioner was subject to the Biennial Review Procedure set out in Florida Administrative Code Rule 23-21.013, which makes no distinction for out-of-state prisoners and, as the Magistrate Judge noted, is qualitatively different than the procedures applicable to individuals convicted on or after April 20, 1982 pursuant to Rule 23-21.006(3)(b)8., the rule Respondents cite.  See Rep't and Recomm. at 15 (comparing the initial review procedure afforded to Petitioner with that provided by Florida Administrative Code Rule 23-21.006(8)).

Contrary to its reliance on Rule 23-21.006(3)(b)8., the Respondent Commission admits that its policy requires "'courtesy interviews (by out-of-state authorities). . . unless the state where the inmate is incarcerated fails to provide a courtesy interview.'"  Doc. 16, Resp. Obj. at 12 (quoting Rep't and Recomm. at 17).[11]  Because Rule 23-21.006(3)(b)8. does not apply to Petitioner and the Commission, despite its argument, did not act pursuant to that rule, whether that rule violates an out-of-state prisoner's right to equal protection is a question that is not properly before this Court.  The Court will instead focus on the Commission's actual practice in the instant case.

The applicable rules set out in Florida Administrative Code Rule 23-

---

[11]  The document that sets out the Parole Commission's policy also states that out-of-state inmates are provided input forms to supplement the paper review. See Doc. 16, Ex. I. However, Petitioner's charge that he was not provided an input form in either 1998 or 2000 is uncontroverted.

21.006(3)(a), and 23-21.006(8), 23-21.013 do not treat in-state and out-of-state inmates differently.[12]   Therefore, to establish an equal protection claim, Petitioner must show "(1) that he is similarly situated to other[s] who received more favorable treatment; and (2) that the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis."   Sweet v. Sec'y, Dep't of Corrections, 467 F.2d 1311, 1318-19 (11th Cir. 2006); see also Thomas v. Georgia State Bd. of Pardons and Paroles, 881 F.2d 1032, 1033 n.3 (11th Cir. 1989) (An equal protection claim based on a parole decision must establish that "parole decisions were made on the basis of race, poverty, or some other constitutionally invalid reason."); Batra v. Bd. of Regents of the Univ. of Neb., 79 F.3d 717, 721 (8th Cir. 1996) (When an equal protection claim does not involve a legislative classification, a plaintiff must show "the presence of an unlawful intent to discriminate against the plaintiff for an invalid reason.").

Petitioner has not attempted to make a showing of invidious discrimination.   Instead, Petitioner argues that the Commission has no rational basis for treating inmates incarcerated outside of Florida differently than those confined within Florida for parole interview purposes.   Assuming for the sake of

---

[12]   On August 17, 2006, the Parole Commission's rules were amended.   The amended rules do treat in-state and out-of-state inmates differently.   The amended rules have not yet been applied to Petitioner and are therefore not at issue.   Under the amended rules, an inmate serving a parole eligible sentence in a facility outside the state of Florida is not entitled to receive an initial parole interview, but the parole examiner may discuss the presumptive parole release date with the inmate by telephone.   Fla. Admin. Code R. 23-21.006(12).   Likewise, for subsequent biennial review, an out-of-state inmate is not entitled to an interview, but has an opportunity to submit comments and materials.   Fla. Admin. Code R. 23-21.013(5) and (6).

argument that the rational basis test is the appropriate test, Petitioner's equal protection claim still fails.

When a legislative classification does not involve a suspect class or a fundamental right, a court must determine whether the classification "is rationally related to a legitimate state interest."  Lofton v. Sec'y of Dep't of Children, 358 F.3d 804, 818 (11th Cir. 2004); Bass v. Perrin, 170 F.3d 1312, 1319 (11th Cir. 1999) (stating that discriminatory treatment of non-protected class is reviewed for rational basis).  The first prong of rational-basis analysis requires a court to identify a legitimate governmental purpose that the "government body *could* have been pursuing" in establishing a discriminatory classification.  United States v. Ferreira, 275 F.3d 1020, 1026 (11th Cir. 2001).  Next, a court inquires whether a rational basis exists to believe that the challenged action would further the hypothesized purpose.  Id.  The relationship between the challenged classification and its goal should not be "so attenuated as to render the distinction arbitrary or irrational . . . ."  Id.

In submitting copies of the requests dated August 17, 1998 and June 21, 2000,[13] the Commission contends that it "did everything required of it" and that Nevada never responded to the written requests.  (Doc. 16 at 12.)  The fact that Respondents attempted, albeit unsuccessfully, to arrange a courtesy interview

---

[13] The June 21, 2000 request for a courtesy interview indicated that input form was attached for Petitioner's use. (Doc. 16, Ex. H.) However, there is a question as to whether the June 21, 2000 letter was properly addressed to Nevada officials. See Doc. 16, Ex. H; Doc. 17 at 8. The portion of the heading indicating to whom the letter was addressed has been redacted. Similarly, the portion of the letter that presumably states where the Petitioner was incarcerated has also been redacted from that letter.

CASE NO: 4:03cv376-SPM/AK

for Petitioner indicates that Respondents did not set out to subject Petitioner to disparate treatment, based on his out-of-state classification, with respect to parole interviews.  See supra text accompanying note 11.  Instead, the Commission assigns its failure to provide for Petitioner's interview to "entities not under the Commission's authority [who] apparently 'dropped the ball.'"  (Doc. 16 at 12.)

The inquiry then properly focuses on whether the Respondent Commission acted rationally when, faced with a nonresponsive "receiving state," it proceeded to make a parole determination based on Petitioner's file without interviewing Petitioner on its own.  The Commission cites "economic and budgetary restraints" for denying out-of-state prisoners the parole interview which is granted to in-state prisoners. The Court recognizes the infeasibility of sending parole examiners to other states and accepts saving money as a legitimate state interest.  Therefore, the Respondent Commission satisfies the first prong of rational basis analysis.

Next, Petitioner has the burden of "negat[ing] every conceivable basis which might support [the rule], whether or not the basis has a foundation in the record." Jackson v. State Bd. of Pardons, 331 F.3d 790, 797 (11th Cir. 2003). Petitioner argues that "[w]ith the use of telecommunications, or having Nevada conduct a hearing . . . any claim that extraordinary expense mandates denial of the interview [is negated]."  (Doc. 13.)  Indeed, the Commission recognizes that

there are ways to provide an out-of-state prisoner with an interview even in light of the cited "economic and budgetary restraints."  <u>See</u> Doc. 12, Ex. 5.  The record shows that the Respondent Commission attempted to arrange for a parole interview in accordance with its policy and that the failure to effectuate that interview is the result of incompetence, and not the result of a purposeful classification that denied Petitioner equal protection of the laws.  <u>See</u> <u>Rickets v. Jones</u>, 901 F.2d 1058, 1060-61 (11th Cir. 1990) ("Merely negligent conduct is insufficient to support a claim for denial of equal protection.").

  While the Court understands Petitioner's frustration with the chronic miscommunication, the Court finds that the Respondent Commission's decision to go forward with the paper review was rational in light of what it perceived to be Nevada's failure to respond to its requests for courtesy interviews.  Moreover, the actual difficulties in coordinating with various in-state and out-of-state officials to conduct a parole interview provide a rational basis for treating out-of-state inmates differently from in-state inmates for parole interview purposes.  In-state and out-of-state inmates are not similarly situated when it comes to the steps necessary to arrange for a parole interview.  The differential treatment is neither arbitrary nor irrational.  Accordingly, the Court finds that Petitioner's equal protection claim fails.

## C. Information Designating Petitioner as an "MDSO"

  The Eleventh Circuit in <u>Monroe</u>, 932 F.2d at 1441-1442, recognized an

exception to the general rule that there is no liberty interest in parole or due process interest in parole procedures unless the state creates the expectancy of parole or limits official discretion to deny parole. In Monroe, the court held that the state parole board acted "arbitrarily and capriciously" in violation of due process when it knowingly relied on false information in the prisoner's file. Id. at 1442.  The court distinguished the facts of Monroe from the facts of an earlier case which held that "prisoners do not state a due process claim by merely asserting that erroneous information may have been used during their parole consideration."  See id.; cf. Slocum v. Georgia State Bd. of Pardons and Paroles, 678 F.2d 940, 942 (11th Cir. 1982).  Therefore, Monroe established an exception for parole determinations which were knowingly made on false information contained in the prisoner's file.  See Monroe, 932 F.2d at 1442.  The court stressed, however, that "federal courts should not interfere with the discretionary decisions of [a state parole] [b]oard 'absent flagrant or unauthorized action' by the [b]oard."  Id. at 1441 (quoting Thomas v. Sellers, 691 F.2d 487, 489 (11th Cir. 1982)).

As set forth above, Petitioner argues that there is false information in his Department of Corrections file that has branded him as a sexual offender. Petitioner complains that this has affected the parole decisions made in his case, as evidenced by the Commission's comment about "mental health concerns." Although Respondents claim that "a thorough review of Petitioner's inmate file

reveals no court document showing commitment for sexual offender treatment[,]"
Respondents puts forth several documents that reference Petitioner's sexual
offender classification.  See, e.g., Doc. 16 Ex. B, C, D, & F (confidential).
Additionally, Respondents argue that because the MDSO classification is
technically correct, reliance on that information is not within the exception
contemplated by Monroe.

Alternatively, Respondents argue that "Petitioner's inmate file contains a
plethora of psychological material evidencing mental problems."  (Doc. 16 at 9.)
Curiously, to support this assertion, Respondents cite Exhibits B, C, and D - the
very exhibits that reference the sexual offender classification.  (Doc. 16, at 9.)
While the Court acknowledges that the record before it, absent any reference to
MDSO classification, would arguably support a finding of "mental health
concerns," the record also reveals that officials have been misled by the
Petitioner's file in the past.[14]

The May 20, 1999 letter from a FDOC administrator confirming that
according to the PSI in Petitioner's inmate file, a "sex act occurred during the
commission of the murder. . ." is the most prominent evidence of the misleading
nature of the documents in Petitioner's file.  See Doc. 12, Ex. 7.  If there is a
document in Petitioner's file to that effect, it is uncontrovertedly incorrect.[15]

---

[14]  For example, in 1992, a deputy general counsel for FDOC was under the impression,
after reviewing certain documents, that Petitioner did not "successfully complete[ ]" the MDSO
program. See Doc. 12, Ex. 12.
[15]  Though evidence may exist the FDOC "partially retract[ed]" certain statements made in
the May 1999 letter, that evidence has not been presented by Respondents. See Doc. 11, Ex. I.
CASE NO: 4:03cv376-SPM/AK

Another glaring example is the Respondent Commission's use of Petitioner's 1975 MDSO commitment to defend its finding of "mental health concerns" in response to the trial court's order to show cause. See Doc. 11, Ex. G at 9.

Monroe limits the exception that recognizes a due process interest in the parole process to those parole decisions made knowingly on false information. See Monroe, 932 F.2d at 1442. In Monroe, the court found that such action violated the prisoner's right to due process. Id. The court cautioned, however, that a petitioner's claims that false information may have been used in the parole decision are insufficient to trigger review by the district court. See id. Thus, in the instant case, Petitioner must show that there was false information in his FDOC inmate file at the relevant time and that the parole board relied on that information in making a parole decision while knowing the information to be false. Petitioner falls short on both prongs.

First, Petitioner has not shown that the PSI or other material in his FDOC inmate file that states that "a sex act occurred during the commission of the murder." In fact, the PSI produced by the Respondent Commission does not contain such a statement. (Doc. 16, Ex. A.) The statement to that effect in the May 1999 letter from an FDOC administrator appears to be the product of the misleading nature of Petitioner's MDSO classification rather than direct evidence that such a false statement exists or existed in Petitioner's file.  And while the MDSO classification is misleading, it is technically correct and not contemplated

by <u>Monroe</u>.

Second, even assuming Petitioner could show that false information exists or existed in his FDOC inmate file, Petitioner has presented no evidence that the Commission knowingly relied on the false information when making parole decisions in his case. Finally, the parole commission has a duty to consider in good faith all relevant information in an inmate's FDOC file in making parole decisions. <u>See</u>, <u>e.g.</u>, Fla. Stat. § 945.25(1) ("It shall be the duty of the Department of Corrections to obtain and place in its permanent records information as complete as may be practically available on every person who may be sentenced to supervision or incarceration under the jurisdiction of the department"). Thus, the Court finds that, absent a showing of flagrant unauthorized action on the part of Respondents such as knowingly relying on false information, Petitioner has not proven a due process violation.

**<u>Conclusion</u>**

The Court, after review of the new information in the record supplied by the Respondent Commission, finds a follows:

1) Petitioner has failed to show a procedural due process right to a parole interview or flagrant or unauthorized action on the part of Respondents in their failure to provide Petitioner with a parole interview that could give rise to a substantive due process claim.

2) In light of the new information showing that the Respondent

CASE NO: 4:03cv376-SPM/AK

Commission attempted to request a parole interview for Petitioner, Petitioner has not shown that Respondents treated him differently on arbitrary or irrational grounds. Thus, Petitioner's equal protection claim fails.

3) Petitioner's due process claim based on <u>Monroe</u> also fails because Petitioner has failed to show that false information existed in his file during his parole consideration.

Accordingly, it is ORDERED and ADJUDGED as follows.

1.   The petition for writ of habeas corpus (Doc. 1) is hereby DENIED.

2.   The Petitioner's motion for discovery is DENIED.

3.   The Florida Parole Commissions shall supplement its records with a copy of this Order and furnish a copy of this Order to the Florida Department of Corrections to be placed in Petitioner's inmate file pursuant to the Department's duty to "obtain and place in its permanent records information as complete as may be practically available on every person who" may be subject to parole. Fla. Stat. § 945.25(1).

4.   The Clerk of Court shall seal any exhibits attached to document 16 that are designated "confidential."

DONE AND ORDERED this 28th day of March, 2007.

_s/ Stephan P. Mickle_

Stephan P. Mickle
United States District Judge

CASE NO: 4:03cv376-SPM/AK